Filed 9/18/24  In re C.D. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| In re C.D., a Person Coming Under the Juvenile Court Law. | C100753 |
| PLACER COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | (Super. Ct. No. 53005337) |
| Plaintiff and Respondent, | |
| v. | |
| M.E., | |
| Defendant and Appellant. | |

Appellant M.E. (mother) appeals from the juvenile court's orders terminating parental rights and freeing the minor for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1] Mother contends the juvenile court erred in finding that the beneficial parental relationship exception to the termination of parental rights did not apply.  Concluding that mother has not established error, we will affirm the juvenile court's orders.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

BACKGROUND

In June 2022, mother experienced extreme depression and post-traumatic stress disorder, and there were concerns that her psychosis was contributing to her inability to attend to her daily needs as well as those of the then four-year-old minor. Mother told the Placer County Department of Health and Human Services (Department) she could not get out of bed, and she requested assistance in caring for the minor. She said she had thoughts of suicide and of hurting others, but she would not elaborate. The Department took the minor into protective custody and placed him in a foster home. Mother was placed on a psychiatric hold. The Department filed a section 300 petition on behalf of the minor alleging that mother failed to provide regular care due to her mental illness (§ 300, subd. (b)), and failed to provide care or supervision because she was on a psychiatric hold and father's whereabouts were unknown (§ 300, subd. (g).[2] The petition was subsequently amended to strike the allegation as to father.

On August 16, 2022, the juvenile court sustained the amended petition and ordered the following: removal of the minor, placement with a non-relative extended family member, reunification services for mother but not for father (who had not yet appeared in the proceeding), and supervised visits for mother.

The minor's court-appointed special advocate (advocate) filed a report on January 25, 2023, addressing the minor's status in foster care. The advocate reported that the minor was very happy with his new house and foster family. The minor's placement was stable and his foster parents supported him, made him feel safe, and met all his needs.

According to the advocate's report, the minor referred to mother by her first name and did not often talk about her. Mother's twice-weekly supervised visits had been

---

[2] Mother said J.P. (father) might be living out of state. The juvenile court eventually found father to be the minor's biological father.

inconsistent. The minor indicated he looked forward to talking to mother but also expressed feeling sad after a visit with her. The advocate recommended that the minor stay in the care of the foster parents, expressing concern that mother had not done everything she needed to do for the minor to safely return to her care. The advocate noted that the minor loved mother, but mother would need consistency in her visits, therapy, and medication management for reunification to occur.

In August 2022, mother reported she was living in her car and unable to visit the minor. The social worker encouraged mother to call a Placer County hotline for housing assistance, but mother did not seek such support because her husband at the time decided where they would live. By September 2022, mother was living in Sacramento County shelters and did not want to move to Placer County. But over the next several months, mother was evicted from a shelter for breaking the rules.

By February 2023, mother had only participated in some individual counseling sessions and had yet to complete a psychiatric evaluation or a psychotropic medication evaluation. She was offered, but did not participate in, codependency classes, a women's empowerment program, and parenting classes. She was still unemployed and living in a vehicle with her boyfriend, D. Her visits with the minor were inconsistent.

Due to some behavioral problems, the minor was placed with a new foster family in February 2023, and then moved to a third foster placement.

At the six-month review hearing on February 14, 2023, the juvenile court found that mother had made minimal progress in alleviating or mitigating the issues necessitating removal, and that return of the minor would create a substantial risk of detriment. The juvenile court ordered continued reunification services for mother, transferred her medical and mental health rights to the Department, transferred her educational rights to the advocate, and ordered twice-weekly supervised visits.

Mother's visits with the minor became more consistent. The minor talked often about his "Mommy" and his memories with her and looked forward to his time with her.

3

However, during a visit in early March 2023, mother reportedly told the minor she would not be seeing him again, which made him very upset.  She moved out of state with her new boyfriend, R., a long-haul truck driver, but she returned the following month.  The Department reported that although mother maintained a strong emotional bond with the minor, her living situation negatively impacted her ability to maintain in-person contact with the minor, and her life choices also contributed to her lack of consistency.

In July 2023, the Department reported that the minor continued to engage in some challenging behaviors but he was doing well in his current placement and was participating in therapy.

The minor said he wanted to return to mother so they could share the same room like before, but mother was living with her former boyfriend, D., and refusing to provide D.'s last name for fear he would not pass a background check.  When D. threatened her with violence, she left D. and got back together with ex-boyfriend R.  She asked to take the minor on the road with her.  But she eventually left R. and returned to D.  The social worker informed mother that the men in her life were a barrier to reunification.  Mother conceded her relationship with D. was not good for her and said she had spoken with father and was hopeful the minor would be returned to him in Tennessee so she and R. could move nearby and she could share parental duties with father.

Mother was not engaged in her service plan.  She was living in a car and unemployed.  She did not avail herself of assistance, saying she was not in a steady place.

The Department reported that, although mother maintained a strong emotional bond with the minor, her living situation and her life choices contributed to her lack of consistency and negatively impacted her ability to maintain contact with the minor.  The Department recommended the juvenile court terminate mother's reunification services, reduce the frequency of mother's visits, and set a section 366.26 hearing.

The advocate reported that the minor wanted to stay with his foster parents because he loved them, their house, his school, and all the parks nearby.  The minor said

4

mother was his "number one Mommy" who brought him snacks when she came to visit him. When asked what he wanted, the minor said he wanted to live with the foster parents but see mother frequently. The foster parents gave the minor the love, boundaries, and patience he needed. According to the advocate, the minor was making significant progress with his behavior and his mental and physical health.

At the 12-month review hearing on September 19, 2023, mother acknowledged that she did not access any of the housing programs known to her. Stable housing and employment continued to be an issue for her. She said she had moved between Sacramento County and Placer County quite a few times.

Social worker Mills testified she attempted to meet with mother many times but mother either did not answer the phone, had to work, cancelled a scheduled meeting, or moved. Mills said visits between mother and the minor were generally positive and that mother maintained a strong emotional bond with the minor. The minor transitioned easily to and from visits and looked forward to seeing mother. However, Mills recommended that mother's visits be decreased to ensure the minor's emotional well-being. Mills noted that, in the past, mother would bring D. to some of the visits. Following those visits, the minor exhibited some behavioral issues.

The Department said mother had only completed one component of her case plan, the psychological evaluation. The juvenile court noted that mother had wasted 12 months and put her relationships with men over the minor at least three times. The court found mother's participation in services was minimal, terminated her reunification services, continued visits as previously ordered, and set the matter for a section 366.26 hearing.

The section 366.26 report filed on December 26, 2023, stated that the minor had been with his foster parents for 10 months and that he had a strong relationship with them. The foster parents confirmed their desire to adopt the minor if reunification failed. The minor called his foster parents "Mom and Dad" and stated he would like to live with them "forever." The Department noted that, while there was a positive emotional

5

attachment between the minor and mother, the minor considered the foster parents to be his parents. There was no reported change in the minor's behavior when mother failed to visit, and the minor had on occasion requested to end visits early to engage in other activities with the foster parents. The Department concluded that severing the relationship between the minor and mother would not lead to emotional instability or negative behavioral changes because the minor was thriving in his current placement, he was bonded with his foster parents and their extended family, he was enrolled in therapy, and his foster parents addressed any emotional and behavioral concerns as recommended by the therapist. The minor said he wanted to be adopted by his foster parents and understood that being adopted would mean not returning to mother. The foster parents were committed to honoring the minor's wishes regarding contact with mother post-adoption so long as it was in the minor's best interest.

The advocate's report, filed December 26, 2023, noted that the minor always referred to his current placement as "home" and his foster parents as "Mom and Dad." The minor said he had fun with mother but he was thankful for the foster parents. The advocate reported that visits with mother were becoming more consistent and they were something the minor looked forward to. He talked about mother often and said he would like her to spend the night at his house if the foster parents said it would be okay.

On January 9, 2024, mother filed a section 388 petition asking the juvenile court to reinstate her reunification services. She said she was engaged in therapy, living in a safe setting, stable with her medications, employed, consistent with visits, and participating in online classes. She claimed the requested change was in the minor's best interest, he was bonded with her, and wanted her in his life.

The section 366.26 hearing and the hearing on mother's section 388 petition were held contemporaneously on February 13, 2024. After mother testified, the juvenile court noted that visitation had been positive and mother was medication compliant, but she had disappeared from the minor's life as recently as the summer of 2023. Mother did not

6

begin therapy until December 2023, and she had not yet completed parenting classes. The juvenile court denied mother's petition, concluding that circumstances were changing but had not yet changed and a reinstatement of reunification services would not be in the minor's interests.

Regarding termination of parental rights, the juvenile court assessed whether an exception to adoption existed and found that mother had maintained regular visitation although visits had not progressed past supervised. Considering the Department's most recent report and case plan, the visitation logs, the advocate report, and the wishes of the minor expressed to different people, the juvenile court said mother had not established that her relationship with the minor promoted the minor's well-being to such a degree as to outweigh the well-being the minor would gain in a permanent home with adoptive parents, and that return of the minor to mother would create a substantial risk of detriment to the minor. The juvenile court found no exception to adoption applied and terminated parental rights, identifying adoption as the permanent plan.

## DISCUSSION

Mother contends the juvenile court erred in finding that the beneficial parental relationship exception to adoption did not apply.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . The permanent plan preferred by the Legislature is adoption. [Citation.]' [Citations.] If the court finds the child is adoptable, it must terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368, italics omitted.) There are limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when the parents have maintained regular visitation and contact with the child, the child would benefit from continuing the

7

relationship, and termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *In re Caden C.* (2021) 11 Cal.5th 614, 625-626 (*Caden C.*).)

The party claiming the beneficial parental relationship exception has the burden of establishing supporting circumstances. (*Caden C., supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) The parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent – the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent[-]child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*, 11 Cal.5th at p. 630; *In re K.P.* (2012) 203 Cal.App.4th 614, 622.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Caden C.*, at p. 641.)

There is no dispute that the first element, regular visitation and contact, was satisfied. Mother focuses on the second element, arguing there was a substantial, positive emotional bond and the minor would benefit from continuing his relationship with her.

She argues this was demonstrated by the minor's statements that he wanted to continue to see mother and live with her, as well as the fact that mother engaged well with the minor, brought him toys, asked him appropriate questions, was affectionate towards him, maintained a strong emotional bond with him, and was able to soothe and calm him when necessary. She claims the minor looked forward to visits with her and had no negative behaviors when visits ended.

But even if there was a positive emotional bond, as mother contends, mother did not meet her burden to prove the third element, that the attachment was so significant that terminating it would be detrimental to the minor even when balanced against the countervailing benefit of a new, adoptive home. (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Autumn H., supra*, 27 Cal.App.4th at p. 575.) Although the minor spent the first four and one-half years of his life in mother's care, he has spent the remainder of his six years in foster care, and the most recent 11 months with his current foster family. By all accounts, the minor had a strong emotional bond with mother. But he had quickly developed a strong emotional bond with his foster parents.

The minor enjoyed visits with mother and looked forward to seeing her. However, the minor transitioned easily to and from visits with mother, he never exhibited negative behaviors or distress when visits ended, and he was never observed to be suffering emotionally when mother was either late to visits or failed to visit altogether, something that occurred with some frequency. During telephone visits with mother, the minor often communicated with his foster mom and would occasionally ask to end the call early so he could engage in other activities with his foster parents. The minor said he considered his foster parents to be his parents and referred to them as "Mom and Dad."

Mother claims the minor would suffer detriment if the relationship were to be severed, relying primarily on argument offered by minor's counsel in the juvenile court. Her reliance is misplaced, as unsworn representations by counsel are not evidence. (*In re Heather H.* (1988) 200 Cal.App.3d 91, 95; Evid. Code, § 140.) In any event, there is no

9

evidence the minor would be greatly harmed by severance of the relationship such that mother's parental rights must not be terminated. (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)

Mother suggests that the reason the minor did not exhibit distress when visits ended or when they did not occur was that the minor felt secure in the knowledge that mother was a fixture in his life and would continue to see him. But we do not reweigh the evidence or second-guess the weight the juvenile court assigned to such evidence. Our mandate is to "uphold the juvenile court's determinations even where substantial evidence to the contrary also exists." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1225; see *Caden C., supra*, 11 Cal.5th at p. 640.) Mother has not established error.

DISPOSITION

The juvenile court's orders are affirmed.


                                                             _____/S/_____

                                                             MAURO, J.

We concur:


_____/S/_____
ROBIE, Acting P. J.


_____/S/_____
DUARTE, J.